2004 SD 112

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Rocco William DISANTO, Defendant and Appellant.**

**No. 22751.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 17, 2003.

Decided Oct. 6, 2004.

Lawrence E. Long, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Joel P. Landeen, Office of Public Defender for Lawrence County Deadwood, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Defendant told several people of his intent to murder his former girlfriend and her new boyfriend. Unknown to defendant, his design was revealed to the authorities and they had a police officer pose as a contract killer to interject himself in the plan. Defendant and the "hit man" discussed the murders, wherein defendant wanted each victim shot twice in the head. He directed the feigned killer to the former girlfriend's address, gave him a picture of her, provided details on what valuables could be obtained during the killings, instructed him to kill a child witness if necessary, and issued a final command to proceed with the murders. Shortly afterwards, however, defendant communicat-

ed with an intermediary that he wanted to "halt" the murders, saying "I'm not backing out of it, I just want to put it on hold." In his trial for three counts of attempted first-degree murder, defendant unsuccessfully sought a judgment of acquittal claiming that the evidence was insufficient to establish that he went further than mere preparation for the offenses. The jury convicted him on all three charges. We reverse the convictions because defendant's actions amounted to no more than mere preparation: neither he nor the feigned killer committed an act toward the commission of the offenses.

### Background

[¶ 2.] Defendant, Rocco William "Billy" Disanto, and Linda Olson lived together for two years and were engaged for a short time. But their turbulent relationship ended in January 2002. Olson soon began a new friendship with Denny Egemo, and in the next month, they moved in together. Obsessed with his loss, defendant began making threatening telephone calls to Olson and Egemo. He told them and others that he was going to kill them. He also sued Olson claiming that she was responsible for the disappearance of over $15,000 in a joint restaurant venture.

[¶ 3.] On February 17, 2002, while gambling and drinking at the First Gold Hotel in Deadwood, defendant told a woman that he intended "to shoot his ex-girlfriend, to kill her, to shoot her new lover in the balls so that he would have to live with the guilt, and then he was going to kill himself." As if to confirm his intention, defendant grabbed the woman's hand and placed it on a pistol in his jacket. The woman contacted a hotel security officer who in turn called the police. Defendant was arrested and a loaded .25 caliber pistol was taken from him.

[¶ 4.] In a plea bargain, defendant pleaded guilty to possession of a concealed pistol without a permit and admitted to a probation violation. For his probation violation, he was sentenced to two years in the South Dakota State Penitentiary with nine months suspended. He received a concurrent one-year jail sentence with all but five days suspended for the offense of carrying a concealed pistol without a permit.

[¶ 5.] While in the penitentiary, defendant met Stephen Rynders. He told Rynders of his intention to murder Olson and her boyfriend. Rynders gave this information to law enforcement and an investigation began. In June 2002, defendant was released from prison. Upon defendant's release, Rynders, acting under law enforcement direction, picked defendant up and offered him a ride to Lead. Inevitably, the conversation turned to defendant's murder plans. At the suggestion of the investigators, Rynders told defendant that he should hire a contract killer who Rynders knew in Denver.

[¶ 6.] On the afternoon of June 11, 2002, Rynders and Dale McCabe, a law enforcement officer posing as a killer for hire from Denver, met twice with defendant. Much of their conversation was secretly recorded. Defendant showed McCabe several photos of Olson and gave him one, pointed out her vehicle, led him to the location of her home, and even pointed Olson out to him as she was leaving her home. In between his meetings with McCabe that afternoon, by chance, defendant ran into Olson on the street. Olson exclaimed, "I suppose you're going to kill me." "Like a dog," defendant replied.

[¶ 7.] Shortly afterwards in their second meeting, defendant told McCabe, "I want her and him dead." "Two shots in the head." With only one shot, he said, "something can go wrong." If Olson's teenage daughter happened to be present,

then defendant wanted her killed too: "If you gotta, you gotta, you know what I mean." He wanted no witnesses. He suggested that the murders should appear to have happened during a robbery. Because defendant had no money to pay for the murders, he suggested that jewelry and other valuables in the home might be used as partial compensation. He told McCabe that the boyfriend, Egemo, was known to have a lot of cash. Defendant also agreed to pay for the killings with some methamphetamine he would later obtain.

[¶ 8.] At 3:00 p.m., defendant and McCabe appeared to close their agreement with the following exchange:

McCabe: So hey, just to make sure, no second thoughts or . . . .

Defendant: No, none.

McCabe: You sure, man?

Defendant: None.

McCabe: Okáy.

Defendant: None.

McCabe: The deal's done, man.

Defendant: It's a go.

McCabe: OK. Later. I'll call you tonight.

Defendant: Huh?

McCabe: I'll call you tonight.

Defendant: Thank you.

McCabe would later testify that as he understood their transaction, "the deal was sealed at that point" and the killings could be accomplished "from that time on until whenever I decided to complete the task."

[¶ 9.] Less than three hours later, however, defendant, seeking to have a message given to McCabe, called Rynders telling him falsely that a "cop stopped by here" and that Olson had spotted McCabe's car with its Colorado plates, that Olson had "called the cops," that defendant was under intense supervision, and that now the police were alerted because of defendant's threat against Olson on the street. All of this was untrue. Defendant's alarm about police involvement was an apparent ruse to explain why he did not want to go through with the killings.

Defendant: So, I suggest we halt this. Let it cool down a little bit. . . .

Rynders: Okay.

\* \* \*

Defendant: So I don't know if that house (Olson's) is being watched, do you know what I'm saying?

Rynders: Okay.

\* \* \*

Defendant: And, ah, the time is not right right now. I'm just telling you, I, I don't feel it. I feel, you know what I mean. I'm not backing out of it, you know what I'm saying.

Rynders: Um hm.

Defendant: But, ah, the timing. You know what I mean. I just got out of prison, right?

\* \* \*

Defendant: So, ah, I'm just telling you right now, put it on hold.

Rynders: Okay.

Defendant: And that's the final word for the simple reason, ah, I don't want nothing to happen to [McCabe], you know what I mean?

\* \* \*

Defendant: Let it cool down. Plus let's let 'em make an offer . . . . [referring to defendant's lawsuit against Olson]

**Rynders:** Well, I have no clue where [McCabe is] at right now.

**Defendant:** Oh, God. You got a cell number?

\* \* \*

**Defendant:** Get it. . . .

**Defendant:** I just don't feel good about it to be honest and I'll tell 'ya, I've got great intuition.

**Rynders:** Okay.

\* \* \*.

**Defendant:** So, I mean, just let him [McCabe] know. Alright buddy?

**Rynders:** Okay.

**Defendant:** Get to him. He's gonna call me at 11 tonight.

[¶ 10.] Despite this telephone call, the next day, McCabe, still posing as a contract killer, came to defendant at his place of employment with Olson's diamond ring to verify that the murders had been accomplished. McCabe drove up to defendant and beckoned him to his car.

**McCabe:** Hey, man. Come here. Come here. Come here. Jump in, man. Jump in, dude.

**Defendant:** You sure?

**McCabe:** Jump in.

**Defendant:** I can't, I can't leave the bakery. I ain't got the key.

**McCabe:** Fuck, I gotta get the fuck out of here, dude. It's done, man. Fuckin' done, dude.

**Defendant:** Okay. I don't wanna know nothin' about it.

**McCabe:** All right. Check this out, man. [Showing him Olson's diamond ring.]

**Defendant:** No.

**McCabe:** Here.

**Defendant:** I don't wanna see nothin'.

**McCabe:** I got that shit.

**Defendant:** Good.

\* \* \*

**McCabe:** Hey. You still owe me some shit, man.

**Defendant:** Guaranteed.

[¶ 11.] Defendant was arrested and charged with three counts of attempted murder. He was also charged with one count of simple assault for the threat he made against Olson on the street. The State provided notice that it intended to introduce all the evidence pertaining to defendant's prior arrest and subsequent plea agreement concerning the incident at the First Gold Hotel. Over defendant's objection, the trial court admitted this evidence.

[¶ 12.] A jury convicted defendant of all charges. He was sentenced to three concurrent thirty-year terms of imprisonment in the South Dakota State Penitentiary. In addition, he received a concurrent 365 days in jail. He was fifty-nine years old at the time. These sentences were consecutive to the unfinished two-year term defendant was to serve for his prior felony conviction.

[¶ 13.] On appeal, defendant raises the following issues: (1) Whether the trial court erred in denying his motion for judgment of acquittal and motion for judgment notwithstanding the verdict. (2) Whether his sentence was grossly disproportionate to the crime charged in violation of the Eighth Amendment to the United States Constitution and Article VI, § 23 of the South Dakota Constitution. (3) Whether the State's reliance on evidence of acts committed by defendant for which he had already pleaded guilty violated his double jeopardy protections under the Fifth and

Fourteenth Amendments to the United States Constitution and Article VI, § 9 of the South Dakota Constitution. We need only reach Issue 1.

### Attempted Murder by Hiring Contract Killer

[¶ 14.] Defendant argues that the trial court erred in denying his motion for judgment of acquittal because the State failed to offer sufficient evidence to sustain a conviction on the three counts of attempted murder. A motion for judgment of acquittal under SDCL 23A–23–1 (Rule 29(a)) is the proper vehicle for a sufficiency challenge. *Cf.* 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 467 (2d ed 1982). The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo. *See United States v. Staula*, 80 F.3d 596, 604 (1stCir.1996). We must decide anew whether the evidence was sufficient to sustain a conviction. SDCL 23A–23–1 (Rule 29(a)); *State v. Guthrie*, 2001 SD 61, ¶ 47, 627 N.W.2d 401, 420–21; *see also* 2 STEVEN ALAN CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 9.10 (3d ed 1999) (citing *United States v. Scott*, 437 U.S. 82, 100 n. 13, 98 S.Ct. 2187, 2198 n. 13, 57 L.Ed.2d 65 (1978)). In measuring evidentiary sufficiency, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

[¶ 15.] In defining the crime of attempt, we begin with our statute. SDCL 22–4–1 states that "Any person who attempts to commit a crime and in the attempt does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration thereof, is punishable" as therein provided. To prove an attempt, therefore, the prosecution must show that defendant (1) had the specific intent to commit the crime, (2) committed a direct act toward the commission of the intended crime, and (3) failed or was prevented or intercepted in the perpetration of the crime. *State v. Olson*, 408 N.W.2d 748, 754 (S.D.1987); *State v. Martinez*, 88 S.D. 369, 371–72, 220 N.W.2d 530, 531 (1974); *State v. Judge*, 81 S.D. 128, 131, 131 N.W.2d 573, 574 (1964).

[¶ 16.] We need not linger on the question of intent. Plainly, the evidence established that defendant repeatedly expressed an intention to kill Olson and Egemo, as well as Olson's daughter, if necessary. As McCabe told the jury, defendant "was a man on a mission to have three individuals murdered."

[¶ 17.] Defendant does not claim error in any of the court's instructions to the jury. The jury was instructed in part that

Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt; but acts of a person who intends to commit a crime will constitute an attempt when they themselves clearly indicate a certain, unambiguous intent to commit that specific crime, and in themselves are an immediate step in the present commission of the criminal design, the progress of which would be completed unless interrupted by some circumstances not intended in the original design. The attempt is the direct movement toward commission of the crime after the preparations are made. Once a person has committed acts which constitute an attempt to commit a crime, that person cannot avoid responsibility by not proceeding further with the intent to commit the crime, either by reason of voluntarily abandoning the purpose or because of a fact which pre-

vented or interfered with completing the crime.

However, if a person intends to commit a crime but before the commission [of] any act toward the ultimate commission of the crime, that person freely and voluntarily abandons the original intent and makes no effort to accomplish it, the crime of attempt has not been committed.

[¶ 18.] Defendant contends that he abandoned any attempt to murder when he telephoned Rynders to "halt" the killings.[1] The State argued to the jury that defendant committed an act toward the commission of first degree murder by giving the "hit-man" a final order to kill, thus making the crime of attempt complete. If he went beyond planning to the actual commission of an act, the State asserted, then a later abandonment would not extricate him from responsibility for the crime of attempted murder. On the other hand, if he only wanted to postpone the crime, then, the State contended, his attempt was merely delayed, not abandoned.

[¶ 19.] On the question of abandonment, it is usually for the jury to decide whether an accused has already committed an act toward the commission of the murders. Once the requisite act has been committed, whether a defendant later wanted to abandon or delay the plan is irrelevant. As Justice Mosk of the California Supreme Court wrote,

It is obviously impossible to be certain that a person will not lose his resolve to commit the crime until he completes the last act necessary for its accomplishment. But the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized. If it

is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is under way, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him.

*People v. Dillon,* 34 Cal.3d 441, 194 Cal. Rptr. 390, 668 P.2d 697, 703 (1983).

 [¶ 20.] The more perplexing question here is whether there was evidence that, in fulfilling his murderous intent, defendant committed an "act" toward the commission of first degree murder. SDCL 22–4–1. Defendant contends that he never went beyond mere preparation. In *State v. Martinez,* this Court declared that the boundary between preparation and attempt lies at the point where an act "unequivocally demonstrate[s] that a crime is about to be committed." 88 S.D. at 372, 220 N.W.2d at 531 (citing *People v. Miller,* 2 Cal.2d 527, 42 P.2d 308, 310 (1935)). Thus, the term "act" "presupposes some direct act or movement in execution of the design, as distinguished from mere preparation, which leaves the intended assailant only in the condition to commence the first direct act toward consummation of his design." *Miller,* 42 P.2d at 310 (citations omitted). The unequivocal act toward the commission of the offense must demonstrate that a crime is about to be committed unless frustrated by intervening circumstances. *State v. Hanson,* 456 N.W.2d 135, 139 (S.D.1990); *Martinez,* 88 S.D. at 372, 220 N.W.2d at 531; *Judge,* 81 S.D. at 128, 131 N.W.2d at 573. However, this act need not be the last possible act before

---

1. The Model Penal Code recognizes that a "complete and voluntary renunciation" of criminal purpose is an affirmative defense to a charge of an attempt to commit a crime. *See* Article 5 § 5.01(4).

actual accomplishment of the crime to constitute an attempt. *State v. Miskimins,* 435 N.W.2d 217, 222–23 (S.D.1989).

[¶ 21.] We have no decisions on point in South Dakota; therefore, we will examine similar cases in other jurisdictions. In murder for hire cases, the courts are divided on how to characterize the offense: is it a solicitation to murder or an act toward the commission of murder? *See generally* Jeffrey F. Ghent, Annotation, *What Constitutes Attempted Murder,* 54 ALR3d 612 (1973). Most courts "take the view that the mere act of solicitation does not constitute an attempt to commit the crime solicited. This issue is particularly significant in a jurisdiction where any crime can be the subject of attempt but only certain crimes can be the subject of solicitation." 4 Charles E. Torcia, Wharton's Criminal Law, § 672 (15th ed Clark Boardman Callaghan 1996). As one commentator explained, "[a]lthough in some jurisdictions solicitations are treated as indictable attempts, either by virtue of judicial decisions failing to distinguish them, or by statutory provisions, the great weight of authority is otherwise. Analytically the two crimes are distinct." Francis Bowes Sayre, *Criminal Attempts,* 41 Harv L Rev 821, 857–58 (1928).

[¶ 22.] A majority of courts reason that a solicitation to murder is not attempted murder because the completion of the crime requires an act by the one solicited.[2] We will examine cases espousing both the majority and minority view to discern which ones are consistent with South Dakota law and precedent. However, it is important in examining out-of-state authority to confine our review to decisions using definitions of criminal attempt similar to our own.

[¶ 23.] Typical of the cases following the majority rule is *State v. Davis,* 319 Mo. 1222, 6 S.W.2d 609 (Mo.1928) (superceded by statute). There, the defendant and the wife of the intended victim plotted to kill her husband to collect the life insurance proceeds and then to live together. A police officer, posing as an ex-convict, met with the defendant several times. The defendant gave the undercover officer a map showing where the husband could be found and two photographs of him. He promised to pay the agent $600, and later paid that sum. He wanted the matter handled so that the murder would appear to have been committed in the course of a robbery. Because the agent employed to commit the murder did not act toward the consummation of the intended crime, the court held that the defendant's acts amounted to no more than solicitation or preparation. Similarly, in *People v. Adami,* 36 Cal.App.3d 452, 111 Cal.Rptr. 544 (1973), the defendant gave an undercover police officer $500, a photograph, and a written description of his wife, with instructions to kill her. The court reversed the conviction, finding that the agent, who had only pretended to agree to commit the murder, had performed no act toward the commission of the crime.

---

**2.** *See also Hobbs v. State,* 548 S.W.2d 884 (Tex.Cr.App.1977); *Hutchinson v. State,* 315 So.2d 546, 548–49 (Fla.App.1975) (holding that solicitation of another to commit murder does not constitute attempt to commit murder because mere solicitation is not overt act toward attempt to commit murder); *Gervin v. State,* 212 Tenn. 653, 371 S.W.2d 449, 451 (1963) (holding that solicitation of another to commit murder does not constitute attempt to commit murder because "[t]o constitute an attempt there must also be an act of perpetration ... [and] solicitation is preparation rather than perpetration") (internal citations omitted); *Hicks v. Commonwealth,* 86 Va. 223, 9 S.E. 1024 (1889) (defendant purchased strychnine and gave it to agent with instructions to place it in the victim's coffee: these were only preparatory measures and not an attempt).

[¶ 24.] In *State v. Otto,* 102 Idaho 250, 629 P.2d 646 (1981), the defendant hired an undercover police officer to kill another police officer investigating the disappearance of the defendant's wife. A divided Idaho Supreme Court reversed the attempted first-degree murder conviction, ruling that the act of soliciting the agent to commit the actual crime, coupled with the payment of $250 and a promise of a larger sum after the crime had been completed, amounted to solicitation to murder rather than attempted murder. The court in *Otto* held that "[t]he solicit[ation] of another, assuming neither solicitor nor solicitee proximately acts toward the crime's commission, cannot be held for an attempt. He does not by his incitement of another to criminal activity commit a dangerously proximate act of perpetration. The extension of attempt liability back to the solicitor destroys the distinction between preparation and perpetration." *Id.* at 650. In sum, "[n]either [the defendant in *Otto* ] nor the agent ever took any steps of perpetration in dangerous proximity to the commission of the offense planned." *Id.* at 651.

[¶ 25.] Requisite to understanding the general rule "is the recognition that solicitation is in the nature of the incitement or encouragement of another to commit a crime in the future [and so] it is essentially preparatory to the commission of the targeted offense." *Id.* at 648 n. 4 (citations omitted). The Idaho Supreme Court made the rather pointed observation that

> [i]t is foreseeable that jurisdictions faced with a general attempt statute and no means of severely punishing a solicitation to commit a felony might resort to the device of transforming the solicitor's

urgings into a proximate attempted commission of the crime urged but doing so violates the very essence of the requirement that a sufficient actus reus be proven before criminal liability will attach.

*Id.* at 651.[3]

[¶ 26.] Cases like *Davis, Otto,* and *Adami* are helpful to our analysis because, at the time they were decided, the statutes or case law in those jurisdictions defined attempt in a way identical to our attempt statute. Under this formulation, there must be specific intent to commit the crime and also a direct act done towards its commission, which failed or was intercepted in its perpetration. As the Missouri Supreme Court noted, "[t]his tougher language was couched in terms of preparation and perpetration, and required that '. . . the defendant must have taken steps going beyond mere preparation, by doing something bringing him nearer the crime he intends to commit.'" *State v. Molasky,* 765 S.W.2d 597, 600 (Mo 1989).

[¶ 27.] To understand the opposite point of view, we will examine cases following the minority rule. But before we begin, we must first consider the definition of attempt under the Model Penal Code, and distinguish cases decided under its formula. In response to court decisions that hiring another to commit murder did not constitute attempted murder, many jurisdictions created, sometimes at the urging of the courts, the offense of solicitation of murder. As an alternative, another widespread response was to adopt the definition of attempt under the Model Penal Code. This is because the Model Penal

---

**3.** This is precisely how the dissenters proceed here. They compare the crime of attempt with the crime of conspiracy and they convert the final solicitation itself into an "act." An attempt to commit a crime is a distinct offense. Defendant was not charged with conspiracy. And a solicitation is still a solicitation even when it comes in the form of a final command for another to proceed. In the end, neither defendant nor McCabe took any "act" toward the perpetration of a crime.

Code includes in criminal attempt much that was held to be preparation under former decisions. ROLLIN M. PERKINS, CRIMINAL LAW 561 (2d ed 1957). This is clear from the comments accompanying the definition of criminal attempt in Tentative Draft No. 10 (1960) of the American Law Institute's Model Penal Code, Article 5 § 5.01. The intent was to extend the criminality of attempts by drawing the line further away from the final act, so as to make the crime essentially one of criminal purpose implemented by a substantial step highly corroborative of such purpose. MODEL PENAL CODE § 5.01(1) (Proposed Official Draft (1962)).

[¶ 28.] The Model Penal Code provides in part that "A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a *substantial step* in a course of conduct planned to culminate in his commission of the crime." MODEL PENAL CODE § 5.01(1)(c) (1985) (emphasis added).[4] The Code then lists in § 5.01(2) several species of conduct that may constitute a "substantial step." The Model Penal Code treats the solicitation of "an innocent agent to engage in conduct constituting an element

of the crime," if strongly corroborative of the actor's criminal purpose, as sufficient satisfaction of the substantial step requirement to support a conviction for criminal attempt. MODEL PENAL CODE § 5.01(2)(g).

[¶ 29.] Representative of decisions under the Model Penal Code is *State v. Kilgus*, 128 N.H. 577, 519 A.2d 231 (N.H. 1986).[5] There, it was held that the defendant's solicitation of a third party to kill the victim constituted attempted murder, where the defendant had completed all the preliminary steps, including setting and paying the contracted for sum, identifying the victim, and instructing the "killer" that the corpse must be found outside the state. The New Hampshire Supreme Court concluded, "[t]his was more than ... 'mere' or 'naked' solicitation. It was a 'substantial step' toward the commission of capital murder." *Id.* at 236.

[¶ 30.] Another decision using the Model Penal Code framework in analyzing the offense of attempt is *State v. Burd*, 187 W.Va. 415, 419 S.E.2d 676 (W.Va.1991). In that case, the court ruled that evidence that the defendant solicited the murder of her boyfriend's wife and child, hired the killer, gave him money for a weapon and an advance on the murder contract, drew a map of the residence of the planned victims, and instructed the killer on how to shoot the victims, supported her conviction

---

4. Many jurisdictions have adopted the "substantial step" framework from the Model Penal Code. *See* ALASKA STAT § 11.31.100 (Supp 1988); ARK CODE ANN § 5–3–201 (Michie 1975); COLO REV STAT § 18–2–101 (2002); CONN GEN STAT § 53a–49 (West 2001); DEL CODE ANN tit 11, § 531 (1987); GA CODE ANN § 16–4–1 (1988); HAW REV STAT § 705–500 (1985); IND CODE ANN § 35–41–5–1 (Michie 1985); ME REV STAT ANN tit 17–A, § 152 (West 1983); MINN STAT ANN § 609.17 (West 1987); NEB REV STAT § 28–201 (1979); NH REV STAT ANN § 629:1 (1986); NJ STAT ANN § 2C:5–1 (West 1982); ND CENT CODE § 12.1–06–01 (1985); OHIO REV CODE ANN § 2923.02 (West 1986); OR REV STAT § 161.405 (1985); PA STAT

ANN tit 18, § 901 (West 1983); WASH REV CODE ANN § 9A.28.020 (West 1988); WYO STAT ANN § 6–1–301 (Michie 1977).

5. Another decision fitting this category is *State v. Sunzar*, 331 N.J.Super. 248, 751 A.2d 627, 632 (1999). By adopting a Model Penal Code type attempt statute the court concluded that "[b]ased on the history outlined above, it appears that our legislature has opted for an expansive version of the attempt law, notwithstanding the 'majority' view, which governs elsewhere." *See also State v. Manchester*, 213 Neb. 670, 331 N.W.2d 776 (1983).

for attempted murder. What is curious about *Burd* is that at the time of that decision the State of West Virginia had a definition of attempt similar to our own. *Id.* at 679. Nonetheless, the Court seems to have adopted the Model Penal Code "substantial step" analysis from *Kilgus* to conclude that hiring the feigned assassin was a "substantial act" toward commission of the crime of attempted murder. *Id.* at 680. In support of its position, the Court cited several other murder for hire cases decided under the Model Penal Code definition of attempt.

[¶ 31.] Finally, another attempted murder case decided under Model Penal Code formulation is *State v. Molasky*, 765 S.W.2d at 597. The decision is instructive. There, a conviction for attempted murder was reversed, but only because the conduct consisted solely of conversation, unaccompanied by affirmative acts. *Id.* at 602. Thus, the court reasoned, "a substantial step is evidenced by actions, indicative of purpose, not mere conversation standing alone." *Id.; accord State v. O'Neil*, 262 Conn. 295, 811 A.2d 1288 (2003) (reversing attempted murder conviction under Model Penal Code formulation where defendant sent message from jail to killer to have witness murdered). Acts evincing a defendant's seriousness of purpose to commit murder, the *Molasky* Court suggested, might be money exchanging hands, concrete arrangements for payment, delivering a photograph of the intended victim, providing the address of the intended victim, furnishing a weapon, visiting the crime scene, waiting for the victim, or showing the hit man the victim's expected route of travel. *Molasky*, 765 S.W.2d at 602. Therefore, under the relaxed standards of the Model Penal Code, evidence of an act in furtherance of the crime could include what defendant did here, provide a photograph of the intended victim and point out her home to the feigned killer.

*Molasky* crystallizes our sense that without the expansive Model Penal Code definition of attempt, acts such as the ones defendant performed here are not sufficient under our definition to constitute attempt.

[¶ 32.] Knowing that the Model Penal Code relaxes the distinction between preparation and perpetration, we exclude from our analysis those murder for hire cases using some form of the Code's definition of attempt. Obviously, we cannot engraft a piece of the Model Penal Code onto our statutory definition of attempt, for to do so would amount to a judicial rewriting of our statute. Nonetheless, there are several courts taking the minority position that solicitation of murder can constitute attempted murder, without reference to the Model Penal Code definition. We will now examine those cases.

[¶ 33.] In *Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978), evidence that the defendant instructed the hired gunman to visit the intended victim in the hospital for purpose of fostering a relationship of trust and confidence was sufficient to establish the required overt act necessary to prove attempted murder requiring an act toward the commission of murder. Alaska's attempt statute at the time is almost identical to ours. The Alaska Supreme Court held that whether an act is merely preparatory or "sufficiently close to the consummation of the crime to amount to attempt, is a question of degree and depends upon the facts and circumstances of a particular case." *Id.* at 637.

[¶ 34.] In *Duke v. State*, 340 So.2d 727 (Miss.1976), the defendant solicited an employee to kill his business partner. The murder was to take place on a hunting trip. That plan failed and the defendant sought to hire another killer. An FBI

agent posed as the killer and collected $11,500 from the defendant after representing to the defendant that the partner was dead. This evidence was held sufficient to sustain the conviction because the court concluded that the defendant's acts went beyond mere preparation.

[¶ 35.] In *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954), a woman who made a contract with two pretended accomplices to have her husband murdered, partly executed that contract by paying a portion of the consideration in advance, identified for the intended assassins the home and the car of the intended victim, pointed out a possible site for disposing of the body, and advised them on the time and place where contact could be made for the execution of the murder. The court held that she was properly convicted of attempted murder, stating, "She did everything she was supposed to do to accomplish the purpose. Had it not been for the subterfuge, the intended victim would have been murdered. Under such circumstances she cannot escape by reason of clever, elusive distinctions between preparation, solicitation and acts committed in furtherance of the design." *Id.* at 416.

[¶ 36.] In *State v. Gay*, 4 Wash.App. 834, 486 P.2d 341 (1971), a wife paid a $1,000 retainer to a feigned killer to assassinate her husband and agreed to pay the killer an additional $9,000 when her husband was dead. She furnished the killer with pictures of her husband so that he would kill the right man and told him about her husband's habits and where he could be found. In upholding her conviction for attempted murder, the court acknowledged that mere solicitation, which involves no more than asking or enticing someone to commit a crime, would not constitute the crime of attempt. However, the court declared that the very act of hiring a contract killer is an overt act

directed toward the commission of the target crime. *Id.* at 345. The court ruled that the defendant had done everything that was to be done by her to accomplish the murder of her husband. Since the feigned assassin had made all the contacts and she had no way to contact him, she could not have stopped him after the final planning. The court concluded that the defendant's attempt to murder her husband was clearly established by the following undisputed evidence: (1) the forged assignment of the insurance policy six months before she hired a man to kill her husband, (2) the payment of premiums on her husband's $50,000 life insurance policy after the divorce had commenced, without the knowledge of her husband, and (3) the hiring of the feigned assassin.

[¶ 37.] The minority view expressed in *Braham, Duke, Gay*, and *Mandel* is epitomized in the dissenting opinion in *Otto*, where it was noted that efforts to distinguish between "acts of preparation and acts of perpetration" are "highly artificial, since all acts leading up to the ultimate consummation of a crime are by their very nature preparatory." *Otto*, 629 P.2d at 653. For these courts, preparation and perpetration are seen merely as degrees on a continuum, and thus the distinction between preparation and perpetration becomes blurred.

[¶ 38.] In interpreting our law, all "criminal and penal provisions and all penal statutes are to be construed according to the fair import of their terms, with a view to effect their objects and promote justice." SDCL 22–1–1. Under our longstanding jurisprudence, preparation and perpetration are distinct concepts. Neither defendant nor the feigned "hit man" committed an act "which would end in accomplishment, but for ... circumstances occurring ... independent of[] the will of

the defendant." *Martinez,* 88 S.D. at 371, 220 N.W.2d at 531.

■ [¶ 39.] We cannot convert solicitation into attempt because to do so is obviously contrary to what the Legislature had in mind when it set up the distinct categories of solicitation and attempt. Indeed, the Legislature has criminalized other types of solicitations. *See* SDCL 22–43–2 (soliciting commercial bribe); SDCL 22–23–8 (pimping as felony); SDCL 22–11–20 (solicitation by witnesses); SDCL 22–22–24.5 (solicitation of minor for sex); SDCL 16–18–7 (solicitation by disbarred or suspended attorney).

■ [¶ 40.] Beyond any doubt, defendant's behavior here was immoral and malevolent. But the question is whether his evil intent went beyond preparation into acts of perpetration. Acts of mere preparation in setting the groundwork for a crime do not amount to an attempt. Under South Dakota's definition of attempt, solicitation alone cannot constitute an attempt to commit a crime. Attempt and solicitation are distinct offenses. To call solicitation an attempt is to do away with the necessary element of an overt act. Worse, to succumb to the understandable but misguided temptation to merge solicitation and attempt only muddles the two concepts and perverts the normal and beneficial development of the criminal law through incremental legislative corrections and improvements. It is for the Legislature to remedy this problem, and not for us through judicial expansion to uphold a conviction where no crime under South Dakota law was committed.

[¶ 41.] Reversed.

[¶ 42.] SABERS, Justice, concurs with a writing and MEIERHENRY, Justice, concurs.

[¶ 43.] GILBERTSON, Chief Justice and ZINTER, Justice, dissent.

SABERS, Justice (concurring).

[¶ 44.] I agree because the evidence indicates that this blundering, broke, inept 59 year-old felon, just out of prison, was inadequate to pursue or execute this crime without the motivating encouragement of his "friend from prison" and law enforcement officers. On his own, it would have been no more than a thought.

GILBERTSON, Chief Justice (dissenting).

[¶ 45.] I respectfully dissent. I would affirm the circuit court.

[¶ 46.] SDCL 22–4–1 defines what constitutes an attempt:

> Any person who attempts to commit a crime and in the attempt does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration thereof, . . . .

[¶ 47.] Herein the Defendant was convicted of three counts of attempted murder. The issue before us is whether he committed a direct act toward the commission of the intended crime. *See State v. Olson,* 408 N.W.2d 748, 754 (S.D.1987); *State v. Martinez,* 88 S.D. 369, 372, 220 N.W.2d 530, 531 (1974); *State v. Judge,* 81 S.D. 128, 133, 131 N.W.2d 573, 575–76 (1964).

[¶ 48.] In *State v. Miskimins,* 435 N.W.2d 217, 222–23 (S.D.1989) we analyzed the nature of the requirement that a direct act be committed:

> In drawing a distinction between preparation and attempt, this court has held that it is not necessary that the last further act necessary to the actual accomplishment of the crime be taken to be a requisite to make an attempt. The statutes clearly require only that "any" act towards the commission of the crime

be done. *State v. Martinez,* 88 S.D. 369, 220 N.W.2d 530 (1974). Any unequivocal act by defendant to insure that the intended result was a crime and not another innocent act constitutes an attempt. "The line between preparation and attempt is drawn at that point where the accused's acts no longer strike the jury as being equivocal but unequivocally demonstrate that a crime is about to be committed." *Martinez,* 88 S.D. at 372, 220 N.W.2d at 531.

We also have previously defined preparation as "devising or arranging the means or measures necessary for the commission of the offense" and attempt as "the direct movement toward the commission after the preparations are made." *Judge,* 81 S.D. at 133, 131 N.W.2d at 575 (quoting *State v. Wood,* 19 S.D. 260, 261, 103 N.W. 25, 26 (1905)). Once "it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action," the attempt is complete. *People v. Dillon,* 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697, 702 (1983) (citations omitted). Thus, we must examine the evidence to see whether there was evidence which would allow a jury to find such an act did occur.

> In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this [C]ourt is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt ... In making our determination, this Court will accept the evidence and the most favorable inferences fairly drawn therefrom, which still support the verdict.

*State v. Augustine,* 2000 SD 93, ¶ 26, 614 N.W.2d 796, 800 (quoting *State v. Davi,* 504 N.W.2d 844, 856 (S.D.1993) (citations omitted)). As pointed out by the Court, the jury was properly instructed on the difference between mere preparation and acts needed to constitute an attempt.

[¶ 49.] Herein the Defendant hired McCabe, a hit man, gave him instructions on how to kill the intended victims, provided the hit man with a photo of Olson, showed him the location of Olson's home and personally pointed Olson out to the "hit man." All these acts constitute devising or arranging the murder for hire scheme. The Defendant's acts of arriving at a concrete payment arrangement for the "hit man's" services and issuing the final kill order "[i]t's a go," were direct movements that served to actually put Defendant's plan into action. The consummation of the contract and final kill order were "immediate step[s] in the present commission of the criminal design" as required by the jury instructions used in Defendant's trial. This is far more than mere verbal solicitation of a hit man to accomplish the murders. *See State v. Mandel,* 78 Ariz. 226, 278 P.2d 413, 416 (1954) (holding *that after defendant did everything she was supposed to do to accomplish the purpose of the murder for hire contract* by making partial payment and advising of when and where murder should be conducted, she was beyond the sphere of mere solicitation or preparation) (emphasis added); *State v. Gay,* 4 Wash.App. 834, 486 P.2d 341, 346 (1971) (holding defendant beyond the preparation stage after making final payment arrangements and down payment, furnishing pictures of intended victim to hit man, *issuing final order without means to contact hit man in order to halt the murder* sufficient to sustain a conviction for attempt) (emphasis added).

[¶ 50.] This evidence, if believed by the jury, was well in excess of the "any act" requirement. It showed Defendant had done everything he could do to carry out his intent to have the killings occur. Defendant had set in motion a course of

action that would have resulted in the deaths of two or three individuals "but for" the fact the hit man was in reality an undercover police officer. It appears the only act left was the actual killings themselves. "In analyzing the facts, the jury was well justified in finding defendant's actions had gone 'so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances.'" *Miskimins,* 435 N.W.2d at 223 (citing *Martinez,* 88 S.D. at 372, 220 N.W.2d at 531 (quoting *Judge,* 81 S.D. at 133, 131 N.W.2d at 575)).

[¶ 51.] Defendant argues that the evidence clearly demonstrates that Defendant's actions in June 2002 did not go beyond mere preparation. Defendant cites the police's failure to arrest Defendant after the June 11, 2002 meeting as proof of this proposition. Defendant also notes that his phone call to Rynders "clearly shows the Defendant put a halt to the attempted commission of the crime ... but chose to do so by remaining friendly and cooperative with the hitman."

[¶ 52.] Two distinct theories can be drawn from Defendant's telephone conversation. The first, posited by Defendant, is that Defendant wished to extricate himself from an agreed upon murder, but leave the "hit man" with the *perception* that the deal remained in place. However, there is a second equally plausible theory which was presented by the State. That is, Defendant merely wanted to delay the previously planned murder, but leave the "hit man" with the *knowledge* that the deal remained in place.

[¶ 53.] Both theories were thoroughly argued to the jury. However, the jury chose to believe the State's theory. Therefore, the jury could have properly concluded Defendant's actions were "done toward the commission of the crime ... the progress of which would be completed unless interrupted by some circumstances not intended in the original design" and not simply mere preparation. (*Supra* at ¶ 17).

[¶ 54.] Although we do not have any South Dakota cases directly on point, *State v. Kaiser,* 504 N.W.2d 96 (S.D.1993) and *State v. Kaiser,* 526 N.W.2d 722 (S.D.1995) are factually and legally close. Therein Kaiser was convicted of two counts of conspiracy to commit murder on his ex-wife and her new boyfriend under SDCL 22–3–8. Like the case at bar, Kaiser sought to have a hit-man commit the murders with a pistol. The murders were to be disguised so as to appear the result of a robbery for illegal drugs. The murders were halted at the last minute when the hit-man revealed the plot to law enforcement. The hit-man now working with law enforcement was able to obtain admissions by Kaiser over the telephone. On appeal Kaiser argued that there was insufficient evidence to uphold his conviction as he failed to commit an overt act in South Dakota. Based on Kaiser' assisting the hit-man by guiding him to the location of the proposed murder and providing the gun for the murders and other information, we affirmed concluding that Kaiser had committed overt acts required for a conviction of a conspiracy charge.

[¶ 55.] The Court today enters a lengthy analysis whether the acts constituted preparation or acts in the attempt to commit murder. I find the "majority" position now taken by the Court to be at odds with this Court's prior interpretation of SDCL 22–4–1.

> The authorities and texts generally agree that it is often difficult to determine when mere preparation to commit a crime ends, and when the act toward the commission of the crime begins. Each case must be determined by its own facts and circumstances. We are in

accord with the view that where the design is shown "courts should not destroy the practical and common sense administration of the law with subtleties as to what constitutes preparation and what an act done toward the commission of a crime."

*State v. Pepka*, 72 S.D. 503, 508, 37 N.W.2d 189, 191 (1949) (citations omitted). Minute examination between majority and minority views and "preparation" and "perpetration" conflict with the command of SDCL 22–1–1:

> The rule of the common law that penal statutes are to be strictly construed has no application to this title. All its criminal and penal provisions and all penal statutes are to be construed according to the fair import of their terms, with a view to effect their objects and promote justice.

[¶ 56.] Here there was evidence that all that was left was to pull the trigger. As the Court acknowledges "the law of attempts would be largely without function if it could not be invoked until the trigger was pulled." Citing *Dillon*, 194 Cal.Rptr. 390, 668 P.2d at 703.

[¶ 57.] I also conclude that the two remaining issues raised by the Defendant are without merit and thus would affirm the trial court. Thus, I respectfully dissent.

ZINTER, Justice (dissenting).

[¶ 58.] I join the Court's legal analysis concerning the distinction between solicitations and attempts to commit murder.[6] Therefore, I agree that Disanto's solicita-

tion of McCabe, in and of itself, was legally insufficient[7] to constitute an attempt to commit murder under SDCL 22–4–1. However, I respectfully disagree with the Court's analysis of the facts, which leads it to find as a matter of law that Disanto "committed [no] act toward the commission of the offense[]." Supra ¶1. In my judgment, the Court's view of the facts is not supported by the record. On the contrary, even setting aside Disanto's solicitation, he still engaged in sufficient other "acts" toward the commission of the murder such that reasonable jurors could have found that he proceeded "so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances." *State v. Martinez*, 88 S.D. 369, 372, 220 N.W.2d 530, 531 (1974). The intended victims were clearly in more danger then than they were when Disanto first expressed his desire to kill them.

[¶ 59.] Specifically, Disanto physically provided McCabe with a photograph of the victim, he pointed out her vehicle, and he took McCabe to the victim's home and pointed her out as she was leaving. None of these acts were acts of solicitation. Rather, they were physical "act[s going] toward the commission" of the murder. SDCL 22–4–1.

[¶ 60.] Although it is acknowledged that the cases discussed by the Court have found that one or more of the foregoing acts can be part of a solicitation, Disanto's case has one significant distinguishing feature. After his solicitation was completed, after the details were arranged, and after Disanto completed the physical acts de-

---

**6.** I also join the Court's analysis of Disanto's defense of abandonment.

**7.** Technically, this specific argument was not presented to the trial court or raised in the appellate briefs. Thus, the trial court did not have an opportunity to address it, and we would not normally rule upon it. However, the argument is a sub-issue of the preserved issue challenging the sufficiency of the evidence. Because we must address it to rule on the sufficiency of the evidence, it is a proper subject for this appeal.

scribed above, he then went even further and executed a command to implement the killing. In fact, this Court itself describes this act as the "final command"[8] to execute the murder. Disanto issued the order: "It's a go."[9] This act is not present in the solicitation cases that invalidate attempted murder convictions because they proceeded no further than preparation.[10]

[¶ 61.] Therefore, when Disanto's final command to execute the plan is combined with his history and other acts, this is the type of case that proceeded further than the mere solicitations and plans found insufficient in the case law. This combination of physical acts would have resulted in accomplishment of the crime absent the intervention of the law enforcement officer. Clearly, the victim was in substantially greater danger after the final command than when Disanto first expressed his de-

sire to kill her. Consequently, there was sufficient evidence to support an attempt conviction.[11]

[¶ 62.] It bears repeating that none of the various "tests" used by courts in this area of the law can possibly distinguish all preparations from attempts. Therefore, a defendant's entire course of conduct should be evaluated in light of his intent and his prior history in order to determine whether there was substantial evidence from which a reasonable trier of fact could have sustained a finding of an attempt. *People v. Memro*, 38 Cal.3d 658, 214 Cal. Rptr. 832, 860, 700 P.2d 446, 474 (1985). In making that determination, it is universally recognized that the acts of solicitation and attempt are a continuum between planning and perpetration of the offense. Whether acts are so preparatory as to not

8. *See supra,* ¶ 1.

9. *See supra,* ¶ 8.

10. This execution order was a significant ·act toward the commission of the murder after the preparations were made. This act distinguishes the Court's cases: See, *People v. Adami*, 36 Cal.App.3d 452, 111 Cal.Rptr. 544 (1973) (mere acts of preparation did not constitute an overt act: there was only a verbal agreement between defendant and the hired killer, the selection of such person to do the killing, and a payment of a portion of the consideration); *State v. Otto*, 102 Idaho 250, 629 P2d 646, 651 (1981) (agreement reached and payment made, but no other overt act identified); *State v. Davis*, 319 Mo. 1222, 6 S.W.2d 609, 612 (1928) (evidence going no further than developing a verbal arrangement with the agent, the delivery of a certain drawing and two photographs of victim to the agent, and the payment of a portion of the agreed consideration were mere acts of preparation); *State v. Molasky*, 765 SW2d 597, 602 (Mo banc 1989) (only prisoner talk about the killings, but no further act that indicated a seriousness of purpose i.e. payment of money, providing a picture or any other corroborative action); *Gervin v. State*, 212 Tenn. 653, 371 S.W.2d 449, 450 ( 1963) (indictment insuffi-

cient because it merely alleged that defendant hired, persuaded, and procured another to attempt to murder another); *Hobbs v. State*, 548 SW2d 884, 886 (TexCrimApp 1977) (indictment was insufficient because it did nothing more than merely plead a promise to pay a named individual to kill another); *Hicks v. Commonwealth*, 86 Va. 223, 9 S.E. 1024 (1889) (indictment insufficient because it did not charge that agent agreed to administer the poison, or that she did any act towards the commission of the crime, and the mere delivery of poison by one person to another, who refuses to administer it or do any act in furtherance of the homicidal design of the person delivering it, does not constitute an attempt to administer poison).

11. Contrary to the Court's suggestion at n3, supra, the foregoing analysis is not premised upon concepts of conspiracy jurisprudence. However, having said that, it is interesting to note that the purpose of distinguishing between preparations and attempts is the same as the purpose of requiring an overt act in a conspiracy case. "The purpose of the overt act is to afford a locus poenitentiae, when either or all the conspirators may abandon the unlawful purpose." *U.S. v. Olmstead*, 5 F.2d 712, 714 (D.C.Wash.1925) (citing *U.S. v. Britton*, 108 U.S. 199, 2 S.Ct. 531, 27 L.Ed. 698).

constitute an attempt or are sufficiently close to consummation of the crime as to constitute an attempt, "is a question of degree and depends upon the facts and circumstances of a particular case." *Braham v. State*, 571 P.2d 631, 637 (Alaska 1977).

[¶ 63.] However, it is generally the jury's function to determine whether those acts have proceeded beyond mere planning. As this Court itself has noted, where design is shown, "courts should not destroy the practical and common sense administration of the law with subtleties as to what constitutes [the] preparation" to commit a crime as distinguished from acts done towards the commission of a crime. *State v. Pepka*, 72 S.D. 503, 508, 37 N.W.2d 189, 191 (1949). Therefore, it should be a rare case to be decided as a matter of law. Ordinarily this issue would be left to the jury. *State v. Sunzar*, 331 N.J.Super 248, 751 A.2d 627, 630 (Ct.Law Div. 1999). We leave this question to the jury because "[t]he line between preparation and attempt is drawn at that point where the accused's acts *no longer strike the jury* as being equivocal but unequivocally demonstrate that a crime is about to be committed." *State v. Miskimins*, 435 NW2d 217, 223 (SD 1989) (emphasis added) (citing *State v. Martinez*, 88 S.D. 369, 372, 220 N.W.2d 530, 531 (1974)).

[¶ 64.] I would follow that admonition and affirm the judgment of this jury. Disanto's design, solicitation, physical acts toward commission of the crime and his final command to execute the murder, when considered together, unequivocally demonstrated that a crime was about to be committed. This was sufficient evidence from which the jury could have reasonably

found that an attempt had been committed.[12]

---

12. Disanto's other issues have no merit.