#25160-r-JKK

**2010 SD 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                Plaintiff and Appellee,

   v.

WILLIE REED,                                Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MERTON B. TICE, JR.
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                                Attorneys for plaintiff
                                                    and appellee.

MICHAEL STONEFIELD
Rapid City, South Dakota                                Attorney for defendant
                                                    and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 26, 2010

OPINION FILED **08/04/10**

#25160

KONENKAMP, Justice

[¶1.]     This appeal presents the question whether a verbal agreement to purchase illegal drugs in the future, without the presence of either the drugs or the purchase money, constitutes an attempt to possess a controlled substance. An undercover agent offered, and defendant accepted, an opportunity to buy a quantity of ecstasy for an agreed price. But no exchange of money or drugs ever occurred. Denying a motion for judgment of acquittal, the circuit court held the evidence sufficient. We reverse because these facts amount to mere preparation and, under the circumstances of this case, defendant's agreement alone was insufficient to convict him.

## Background

[¶2.]     Willie Reed was indicted for conspiracy to commit distribution of a controlled substance and attempted possession of a controlled substance. We recount the supporting facts in a light most favorable to the prosecution. In October 2005, special agent Earl Miranda served as an undercover agent for the South Dakota Division of Criminal Investigation (DCI). Miranda posed as "Tony Hernandez," a California drug dealer. In the course of his investigation, Miranda telephoned Arthur Earl Barfield to arrange a meeting. Barfield was Reed's friend and an unpaid kitchen worker at Reed's nightclub.[1] Miranda met Barfield in Miranda's hotel room and at a Denny's restaurant. Barfield said that he and Reed were interested in buying ecstasy pills.

---

1.     Club 1, 2, 3 is Reed's nightclub and restaurant in Rapid City, South Dakota.

[¶3.] At a meeting in Reed's club, Miranda and Reed began talking and moved to a booth away from the music so they could hear each other. They discussed the possibility of Reed and Barfield purchasing ecstasy pills. According to Miranda, Reed said that he would provide the money and that he, Reed, was "The Man." Miranda later testified that Reed agreed to purchase 1000 pills for $7,000 and that delivery options were discussed, including Fed Ex, UPS, and the postal service. No money exchanged hands. But Reed assured Miranda that $7,000 was available, that delivery could be worked out, and that the pills could be moved in two weeks. Miranda testified that Reed ultimately said, "alright let's go ahead and do it, you know what I'm say'n"? Miranda responded, "Alright."

[¶4.] This conversation embodies the only direct contact between Miranda and Reed. Miranda delivered no pills to Reed, and Reed gave no money to Miranda. Miranda tried to go forward with the sale through Barfield, the middleman. They agreed to meet in Rapid City on two occasions, but the meetings never happened and the deal never occurred.

[¶5.] At trial, Reed testified that Barfield had asked him for $4,000 from proceeds of a grant Reed had received to remodel the nightclub. According to Reed, Barfield said he could "triple the money" by purchasing ecstasy pills and reselling them. Reed testified he was only meeting with Miranda to help his friend get out of "a big drug deal gone bad." Reed conceded that he agreed to the terms and conditions Miranda offered for the purchase of the ecstasy pills, but he was only "play acting" to get rid of the drug dealer for Barfield.

[¶6.] At the end of the State's case, and again at the close of all the evidence, Reed's counsel moved for a "directed verdict," alleging insufficiency of the evidence.[2] The trial court denied both motions. The jury found Reed not guilty of conspiracy to commit distribution of a controlled substance and guilty of attempted possession of a controlled substance.

## Analysis and Decision

[¶7.] On appeal, Reed argues that the trial court erred in not granting a judgment of acquittal because the evidence was insufficient to sustain a conviction for attempted possession of a controlled substance. SDCL 23A-23-3. Our analysis begins with SDCL 22-4-1, defining attempt as "any act toward the commission of the crime" by one who "fails or is prevented or intercepted in the perpetration of that crime[.]" As confirmed in *State v. Disanto*, to prove an attempt, "the prosecution must show that defendant (1) had the specific intent to commit the crime, (2) committed a direct act toward the commission of the intended crime, and

---

2.  At trial, Reed's counsel termed his motion as one for a directed verdict, a motion now abolished. On appeal, Reed's new counsel correctly adverts to a motion for judgment of acquittal. We review de novo a trial court's ruling on a motion for judgment of acquittal, as a question of law:

> We must decide anew whether the evidence was sufficient to sustain a conviction. In measuring evidentiary sufficiency, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

State v. Klaudt, 2009 SD 71, ¶14, 772 NW2d 117, 122 (citing State v. Tofani, 2006 SD 63, ¶24, 719 NW2d 391, 398 (quoting State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206) (internal citations omitted)).

(3) failed or was prevented or intercepted in the perpetration of the crime. 2004 SD 112, ¶15, 688 NW2d 201, 206 (citations omitted). Reed concedes that the evidence established the requisite specific intent.

[¶8.] Reed asserts that he neither failed nor was prevented or intercepted in the perpetration of the crime; he never went beyond mere preparation, and therefore, he committed no direct act toward possession of a controlled substance. "[T]he term 'act' 'presupposes some direct act or movement in execution of the design, as distinguished from mere preparation, which leaves the intended [offender] only in the condition to commence the first direct act toward consummation of his design.'" *Id.* ¶20, 688 NW2d at 207 (citing People v. Miller, 2 Cal2d 527, 42 P2d 308, 310 (1935)). Yet "it is not necessary that the last further act necessary to the actual accomplishment of the crime be taken to be a requisite to make an attempt . . . [but] only that 'any' act towards the commission of the crime be done." State v. Miskimins, 435 NW2d 217, 222-23 (SD 1989) (citing State v. Martinez, 88 SD 369, 220 NW2d 530 (1974)). "The line between preparation and attempt is drawn at that point where the accused's acts no longer strike the jury as being equivocal but unequivocally demonstrate that a crime is about to be committed." *Martinez*, 88 SD at 372, 220 NW2d at 531.

[¶9.] Here, the sole issue is whether there was sufficient evidence for the jury to conclude that Reed committed a direct act toward the commission of the crime beyond mere preparation. In *Disanto*, we held that "[a]cts of mere preparation in setting the groundwork for a crime do not amount to an attempt." 2004 SD 112, ¶40, 688 NW2d at 213. In so doing, we made clear that "[u]nder

South Dakota's definition of attempt, solicitation alone cannot constitute an attempt to commit a crime." *Id*. Evidence tending to prove Reed's guilt included Reed's phone calls with Barfield arranging a meeting place to discuss the drug transaction with Miranda; Reed having his armed bartender act as security when Miranda (the "drug dealer") arrived; Reed and Miranda's relocation in the club to hammer out the details; and, their lengthy discussion regarding delivery options, price, and how long it would take to move the product. Reed admitted at trial that he voiced an agreement to purchase the pills and that he told Miranda he had the $7000 available. Finally, Reed told Miranda, "alright let's go ahead and do it, you know what I'm say'n."

[¶10.] Several federal courts have found agreements to buy drugs sufficient to constitute attempted possession. In *United States v. Runco*, the defendant agreed to purchase cocaine at $15,000 per kilo and he showed the undercover agent the money necessary to make the purchase. 873 F2d 1230, 1232 (9th Cir 1989). Holding that this behavior was unequivocal, the court ruled that the defendant's actions were done purposefully and constituted a "substantial step" in a "course of conduct planned to culminate in the commission of the crime." *Id*.

[¶11.] The First Circuit ruled similar negotiations sufficient to constitute a "substantial step." United States v. Dworken, 855 F2d 12, 19-20 (1st Cir 1988). The defendant's "continuous and serious offers" regarding "price, quality, volume, and location," as well as his examining "a sample of" narcotics, established that he "was prepared to make the deal, as long as [the undercover agent] agreed to his terms." *Id*. at 15, 19. Rejecting the defendant's argument that the negotiations

constituted "mere preparation," the court noted "that the important question is not whether something constitutes 'preparation' or 'attempt,' but whether the behavior does strongly corroborate clear criminal intent." *Id.* at 19.

[¶12.]     In upholding an attempt to possess conviction, the Sixth Circuit was emphatic on the subject of negotiations coupled with intent to possess: "we hold that when a defendant engages in active negotiations to purchase drugs, he has committed the 'substantial step' towards the crime of possession required to convict him of attempted possession." United States v. Bilderbeck, 163 F3d 971, 975 (6th Cir 1999). In that case, the defendant had sampled the cocaine he was negotiating to buy, though no final agreement was reached.

[¶13.]     Two features distinguish our case from these decisions. First, in each of these federal cases, either the drugs or the purchase money or both were present at or near the negotiation point, signifying that an exchange was imminent. Here, neither drugs nor money were about to be exchanged. Second, and more important, these courts have adopted the most recent Model Penal Code definition of attempt. Model Penal Code § 5.01 cmts 329-330 (1985). According to one commentator, the "substantial step" language in the Model Penal Code can "be found in the great majority of the attempt statutes in the modern recodifications." Wayne R. LaFave, 2 Subst. Crim. L. § 11.4(e) (2d ed). The Model Penal Code version "broaden[s] the scope of attempt liability": "(1) the emphasis is upon what the actor has already done rather than what remains to be done; (2) liability will be imposed only if some firmness of criminal purpose is shown; and (3) the conduct may be assessed in light of the defendant's statements." *Id.*

[¶14.] Although the line between preparation and attempt remains "the most difficult problem" in the law of attempt, we conclude that, under South Dakota's statutory definition of attempt and our long-standing precedent, Reed's actions here fall on the side of mere preparation. *Cf.* Model Penal Code § 5.01 cmt 5. Reed only laid the groundwork for the crime. No evidence was shown of a direct act to execute the purchase: no pills and no money to purchase them were displayed, and no final date for delivery or exchange was set. These negotiations for a future transaction were insufficient to constitute a direct act toward the commission of the crime, and thus a criminal attempt was not shown.

[¶15.] Reversed.

[¶16.] ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.

[¶17.] GILBERTSON, Chief Justice, concurs in result.


GILBERTSON, Chief Justice (concurring in result).

[¶18.] I join only in the Court's reversal of this conviction as it continues to adhere to a doctrine which has now been rejected even by its state of origin. I continue to believe that this Court's analysis in *State v. Disanto* is flawed. *See generally Disanto*, 2004 SD 112, ¶¶45-57, 688 NW2d 201, 213-216 (Gilbertson, C.J., dissenting). So does the Supreme Court of California.

[¶19.] The Court's opinion in *Disanto* relied in part on a California Court of Appeals decision, *People v. Adami*, 36 Cal App 3d 452, 111 Cal Rptr 544 (1973), and three other decisions following *Adami*. *See Disanto,* 2004 SD 112 ,¶¶23-26, 688 NW2d at 208-209 (citing State v. Molasky, 765 SW2d 597, 600 (Mo 1989); State v.

Otto, 102 Idaho 250, 629 P2d 646 (1981); State v. Davis, 319 Mo 1222, 6 SW2d 609 (1928)). After our decision in *Disanto,* the Supreme Court of California disapproved *Adami* and what is characterized as a "small number" of authorities following *Adami*, which included the *Disanto* decision. People v. Superior Court, 41 Cal4th 1, 9-10, 157 P3d 1017, 1023, 58 CalRptr3d 421, 427 (2007). The California Supreme Court ultimately concluded:

> But for [the hired killer's] status as an undercover detective, it is likely that [the defendant's] conduct would have resulted in the murder of these victims. Where, as here, the defendant's intent is unmistakable, "'the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.'"

*Id.* at 13, 157 P3d at 1025, 58 CalRptr3d at 428.

[¶20.]     I would reverse the conviction herein as it was no more than a discussion in a bar about drugs. No money was produced, nor were any drugs. No specific follow-up activity occurred in furtherance of a sale - just more talk.