#23418-a-JKK

**2006 SD 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

JOHN TOFANI,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE BOYD L. McMURCHIE
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                          and appellee.

DONNA BUCHER of
Tinan, Smith & Bucher                          Attorneys for defendant
Mitchell, South Dakota                          and appellant.

\* \* \* \*

ARGUED ON NOVEMBER 8, 2005

OPINION FILED **07/12/06**

#23418

KONENKAMP, Justice

[¶1.]     It is one thing to carelessly reveal details that a criminal might later use to commit a crime.  It is another thing to divulge facts with the purpose of promoting or facilitating the commission of a crime.  In this appeal, we are called upon to distinguish the difference.  John E. Tofani was convicted of aiding and abetting Wade Reiner in the rape and aggravated assault of Tofani's fiancée, C.M.  While accepting Reiner's largesse in the form of money, beer, and food, Tofani and his friend told Reiner about how they were "sick of" C.M.  Their discussion proposed that she should be "roughed up and sent out of town."  Someone remarked that "a woman like that" should be beaten and raped.  Reiner said he could do it, but after he did, Tofani claimed that he never took their discussion seriously.  Reiner confirmed that he only "assumed" this was what Tofani wanted.  He also confirmed that he was never specifically asked to commit these crimes against C.M.  Nonetheless, before it happened, Tofani pointed out C.M.'s motel room to Reiner, gave Reiner the key to C.M.'s room and then took it back before Reiner could use it, told Reiner that C.M. was a drug user wanted in Florida, and had Reiner drive him to another town before Reiner returned to commit the crimes.  On appeal, Tofani challenges the denial of his motion to exclude evidence, his motion to suppress, and his convictions.  We affirm in all respects.

## Background

[¶2.]     Tofani was living in Florida when he decided to travel north after a friend of his died.  He wanted to "relocate."  Tofani's fiancé, C.M., also decided to leave Florida because she "wanted to get a fresh start as her past was terrible."  In

-1-

C.M.'s van, she and Tofani first went to Daytona, where they picked up Tim Stone, someone Tofani knew but C.M. did not. The three headed to South Dakota, funding their trip by panhandling and obtaining local community services along the way. They arrived in Mitchell, South Dakota on March 2, 2004, and rented a room at the Corn Palace Motel.

[¶3.] On March 5, 2004, while still at the same motel, Tofani and Stone left, telling C.M. "they would be back with beer and pizza for dinner." They went to the Sudz Bar-Laundromat-Casino, where they met Wade Reiner. Reiner, a resident of Hanson County, was having a bad day. He thought his wife was having an affair and was about to leave him. That morning, he got fed up with his work after being demoted. He walked off the job and then worked on fixing his truck. He was unsuccessful. He tried to do laundry at Sudz, but the machines were out of service. So he went to the bar portion of the establishment, ordered a beer, and began playing video lottery.

[¶4.] Tofani and Stone did not know Reiner before that day. Stone approached Reiner after noticing that Reiner hit a big payout on the video lottery machine. He won $180. Stone struck up a conversation with Reiner, which led Reiner to move to a video lottery machine closer to Tofani and Stone. Reiner joined in their conversation and continued to play video lottery. He bought them beer and, because he "felt sorry for their situation," he gave Tofani and Stone twenty dollars each from his recent winnings. Throughout the afternoon they continued to drink and talk, consuming an estimated eight to ten beers.

[¶5.] According to Reiner, Tofani and Stone's conversation revolved mostly around C.M. and how they were "sick of [her] and wanted to leave her." Their complaints ran the gamut: she nagged, she wanted only the best for herself, and she threatened to report Tofani to the authorities if he ever tried to leave her. Reiner later testified that Tofani and Stone blamed their troubles on C.M., and Tofani referred to her "as a crack whore who would give everybody in the bar a blow job for a line." In Reiner's view, the conversation "was not just two men venting a little steam." Reiner recalled that they said C.M. "should be roughed up and sent out of town, sent back home." Reiner had the impression that he "could do whatever he wanted to with [C.M.]" because Tofani told him he had "paid for her." Unknown to Tofani or Stone, but judging from the rape and bondage themes in the lewd photographs later found in his possession, Reiner had fantasies about beating and raping women.

[¶6.] In contrast to Reiner's account of the conversation at Sudz, a defense witness would later testify that she overheard Tofani and Stone, but they were not bad-mouthing C.M. This witness, Michele Schulte, a legal secretary from Salem, South Dakota, was at Sudz while waiting to meet a friend. She was about ten feet from Tofani and Stone. She described Sudz as a small bar where you could hear almost everything. From eavesdropping, Schulte heard Tofani and Stone speak about C.M.: Tofani only referred to her as his "old lady," and he wanted to leave her. Schulte described Reiner, Tofani, and Stone as belligerent; every other word out of their mouths was f---k. But she heard nothing about raping, beating, or harming C.M. Before Schulte left Sudz, she heard Reiner say that he was going

back to the laundromat to get his clothes. The other two were getting ready to go to Sioux Falls.

[¶7.] Tofani later confirmed to police that he told Reiner that he wanted to get away from C.M. He also admitted that the terms "beaten" and "raped" were used regarding C.M. during their conversation, although he denied using them himself. Reiner's contribution to the conversation was that "there should be a place that you could take 'em and have that done." In response to interrogation, Tofani also confirmed that Reiner said that he "had no problem doing it," he "would take care of it"—he would go over to her motel room and "take care of it." Saying that he himself thought it was all a joke, Tofani later conjectured in hindsight that it was surely Stone and Reiner who had seriously conspired to have C.M. taken care of.

[¶8.] According to Reiner's trial testimony, Stone coaxed Tofani into going to Sioux Falls. Reiner claimed that Tofani was reluctant at first because he had just gotten a job in Mitchell. Nevertheless, Tofani agreed to go and Reiner said he would drive them there. They even discussed whether Reiner would drive them all the way back to Florida, but Reiner would only take them as far as Sioux Falls. Before they left, Stone went to the motel room and grabbed his belongings. When Stone entered the room, C.M. was there. Stone told her that he needed his things to prove to someone that he was homeless so the person would give him money. Tofani did not come to the room or attempt to gather his belongings.

[¶9.] Back together, Tofani, Stone, and Reiner went to another Mitchell bar, TLC, where they "had a couple more beers and bought a twelve pack for the road." Reiner testified that while they were heading out of Mitchell they drove past the

Corn Palace Motel and Tofani and Stone pointed out C.M.'s van and her room. Reiner also said that Tofani threw the room key onto the center console telling Reiner to return it to the motel. A short time later, however, Stone got the key back from him because, according to Tofani, both he and Stone were concerned about Reiner's trustworthiness and the possible danger to C.M. if Reiner had a key to her room. According to Tofani, to get the key back, he and Stone contrived a story about Stone wanting the key as a souvenir.

[¶10.] Eventually, Tofani, Stone, and Reiner arrived at the Pilot Truck Stop in Sioux Falls. Reiner and Tofani went inside where Reiner bought the two of them a meal. Stone remained in the vehicle and drank what beer was left. After Reiner and Tofani finished eating, Reiner gave both men another twenty dollars each and then said he was leaving. Tofani asked for a ride to the nearby Flying J Truck Stop, but Reiner refused. Reiner testified that his plan was to head back to his home in rural Alexandria, South Dakota.

[¶11.] Rather than going home, however, Reiner went to the Corn Palace Motel, walked up to C.M.'s room, and knocked on the door. When C.M. answered, she was on the phone with a local pastor. She had already called the police when her companions failed to return that evening. Now she was seeking advice from the pastor. Standing at the door, Reiner told C.M. that he knew where Tofani and Stone were, and he was there "to get her to bring them back to the hotel." Hearing of this proposal, the pastor warned her not to go with the stranger. She declined the advice and left with Reiner.

[¶12.] Reiner drove C.M. towards Alexandria and then pulled up along a country road in rural Hanson County, where he struck her, pulled her from his car, and forced her to perform oral sex on him. It began when Reiner suddenly struck her without provocation. After he stopped the car, he dragged her out the driver's door towards the rear of the car. He then forced her onto the ground, straddled her, and began choking her. C.M. pretended to pass out and Reiner eventually eased his grip. But then Reiner grabbed her and pulled her head to his midsection and forced his penis into her mouth. When he was finished, he dragged her towards the trunk. C.M. thought Tofani was going to be in the trunk either dead or tied and gagged. C.M. later recounted that Reiner said to her "that money was exchanged for him to do this" or that "money was given to him to do this to me."

[¶13.] Reiner opened the trunk of his car. It was empty. He told C.M. to get in. She pleaded with him—she would not tell anyone; she did not know who he was. Reiner said something to indicate that he knew about her: she was from Florida and was in trouble there. He told her he knew about her past and he could get ransom from her mother in Florida. C.M. told him that she and her mother were not on good terms and Reiner would not get a dime from her. Reiner agreed to take her back to Mitchell, but told her "he could take her towards the motel, but she would have to walk the rest of the way on her own." On the drive back, Reiner stopped to relieve himself and C.M. took the opportunity to run to a nearby farmhouse. The homeowners let C.M. inside and called the police. When law enforcement officers responded, C.M., who appeared beaten and bruised, was taken to Avera Queen of Peace Hospital in Mitchell.

[¶14.]     In the meantime, Tofani and Stone hitchhiked back to Mitchell. According to Tofani, they arrived back at the Corn Palace Motel at 12:38 a.m. About an hour later, C.M. called the motel from the hospital and told Tofani that she had been raped. C.M. testified that after she told him this the line went silent and she heard what sounded like the phone dropping. Thereafter, Stone got on the line and told C.M. Tofani was in shock and could not talk.

[¶15.]     C.M. described her attacker to Sheriff Mark Kessler. Wade Reiner's name immediately came to mind. Reiner was soon arrested and charged with kidnapping, rape, and aggravated assault. Tofani and Stone were brought to the Mitchell Police Department on the morning of March 6, 2005. Neither was under arrest. Tofani was placed in an interrogation room.

[¶16.]     After Tofani had been in the room for ninety minutes, Detective Toby Russell came in and read Tofani his Miranda rights. Tofani signed a Miranda card, acknowledging that he was aware of his rights and was knowingly waiving them. Thereafter, Russell listened to Tofani's explanation of the night's events. Tofani began by describing how he met Reiner and how the three of them ended up in Sioux Falls. He also told Russell that he had a receipt from the truck stop in Sioux Falls, but it was at his motel room.[1]

[¶17.]     In probing for information, Russell told Tofani that Reiner claimed that C.M. was sold to him. Tofani insisted on taking a lie detector test, claiming he

---

1.    This receipt would establish that Tofani was in Sioux Falls at the time C.M. was kidnapped and raped. In closing argument, the state's attorney argued that Tofani's keeping this receipt was a conscious effort to build an alibi for himself.

would never sell anyone or put anyone in a situation like that. Russell then asked about the call C.M. made to Tofani from the hospital. Tofani said that C.M. told him it was the guy from the laundromat who raped her. Russell asked how C.M. knew who it was if she was not at the laundromat. Tofani responded that C.M. said Reiner told her that he knew Tofani and Stone from the laundromat. Tofani again asked if he could see C.M. Russell ended the interview and left the room.

[¶18.]     *The facts in the next two paragraphs were considered for the suppression hearing, but were not admitted as evidence during Tofani's trial to the court.* Tofani was in the room alone for approximately forty minutes before he knocked on the window to ask to use the restroom. Afterwards, Tofani returned with Detective Russell. Russell asked Tofani about the discussion he had with Detective Chris Konrad while in the bathroom, specifically asking Tofani to give a rendition of his statements at Sudz. Tofani agreed with Russell that he said he was sick of C.M. and wanted to leave her. Russell also asked Tofani why only Stone went back to the motel to gather his belongings. Tofani responded that he did not go because he would not be able to explain to C.M. that he was leaving, but if he thought for a second that Reiner was going to go back to C.M.'s room he would have never left her.

[¶19.]     Russell asked about the receipt Tofani said he left at the motel and asked if he would be willing to retrieve it. Tofani agreed and Russell left the room, but before he exited Tofani asked about C.M. again. Thereafter, Tofani, Detective Konrad, and Sheriff Kessler left for the motel and recovered the receipt from

Tofani's room. When they returned to the Mitchell Police Department, Konrad placed Tofani back in the interrogation room.

[¶20.] *The remainder of the facts were offered both in the suppression hearing and at trial.* Detectives Konrad and Russell returned with the receipt. Tofani was asked if he had anything else to tell them now that he had had time to think. Tofani repeated the same statements, that Reiner and Stone talked about how a "bitch like that should be beaten up." When Konrad suggested to Tofani that Reiner said he would take care of that for Tofani, Tofani denied anything of the sort, but he did admit that Reiner told him that he would "take care of it." Tofani claimed he had nothing to hide and that he just did not understand how serious everything was. Then he asked to see C.M. again and Russell told him he did not know when he would get to see her. The interrogation ended.

[¶21.] Tofani was subsequently arrested on March 8, 2004, and indicted on four counts: kidnapping, rape, attempted aggravated assault, and aggravated assault, all as an accessory before the fact. At the arraignment, Tofani's attorney moved for discovery and inspection of the videotapes of Tofani's interview at the Mitchell Police Department. His motion was granted and the State delivered a copy of the interview on seven CDs. When Tofani's attorney attempted to view the CDs, "it was discovered that these disks were incomplete in that some of them would not operate on his computer system or in any other system he attempted to use them on." He immediately informed the State and the Sheriff's office, but was never given a workable CD with Tofani's interview. However, the court permitted counsel to hire an expert to address the problem, if counsel so desired.

[¶22.]    Tofani sought to exclude the evidence.  The motion was denied.  He also moved to suppress any statements he made to law enforcement officers because the officers used undue influence.  This motion was also denied.  Through plea negotiations, Reiner pleaded guilty to rape and an unrelated drug charge and was sentenced to the penitentiary.  As part of his agreement, he would testify against Tofani and Stone.  Tofani waived a jury trial and was found guilty by the court of aiding and abetting Reiner in the rape and aggravated assault of C.M..  In finding him guilty on two of the charges, the judge declared, "the court will state for the record that this is a close call, very close, and I would expect you to order a transcript and appeal. . . ."  Tofani was sentenced to twenty years for the rape and ten years for the aggravated assault, with both sentences to run concurrently.  Stone's charges were later dismissed by the prosecutor.

[¶23.]    On appeal, Tofani asserts that (1) the trial court erred when it denied his motion to exclude evidence, (2) the trial court erred in denying the motion to suppress his statements, and (3) there was insufficient evidence to support a guilty verdict and therefore the court erred in denying defense counsel's motion for judgment of acquittal.

**Standard of Review**

[¶24.]    We review a trial court's decision to deny a motion to exclude evidence under the abuse of discretion standard.  State v. Moran, 2003 SD 14, ¶10, 657 NW2d 319, 323 (citation omitted).  All factual findings we examine under the clearly erroneous standard, but "[a] motion to suppress for an alleged violation of a constitutionally protected right raises a question of law, requiring de novo review."

State v. Hess, 2004 SD 60, ¶9, 680 NW2d 314, 319 (citations omitted).

> The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo. *See* United States v. Staula*, 80 F3d 596, 604 (1stCir 1996). We must decide anew whether the evidence was sufficient to sustain a conviction. SDCL 23A-23-1 (Rule 29(a)); State v. Guthrie*, 2001 SD 61, ¶47, 627 NW2d 401, 420-21; *see also* 2 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 9.10 (3ded 1999) (citing United States v. Scott, 437 US 82, 100 n13 (1978)). In measuring evidentiary sufficiency, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia*, 443 US 307, 319 (1979).

State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206.

## Analysis and Decision

### 1. Motion to Exclude Evidence

[¶25.] Tofani's interview with the Mitchell Police Department was recorded by video camera. In accord with a discovery order, the prosecutor gave a copy of the interview to Tofani's counsel on seven CDs. But not all the CDs worked properly on defense counsel's computer system and counsel notified the state's attorney. Counsel subsequently viewed the interrogation when the CDs were played at Tofani's hearing on his motion to suppress.[2]

---

2. At the suppression hearing the State represented that video disk six was forty-five minutes of silence because the defendant and the officers were retrieving the receipt from his motel room. Defense counsel stipulated to this, and the court never listened to disk six. Unknown to the court, the State, or the defense, disk six actually contains about fourteen minutes of interrogation. The interrogation began when Detective Konrad brought Tofani back after retrieving the receipt. But, we find nothing exculpatory or indicative of coercion by the police evidenced by the information on disk six.

[¶26.] Still, Tofani contends he was prejudiced because the State failed to produce playable CDs. Moreover, he claims that the opportunity to hire an expert to assist with the troubles and the chance to view the original on the sheriff's computer did not eliminate the prejudice Tofani experienced because counsel did not have adequate time to prepare a defense concerning the statements. Counsel argues that the existence of prejudice is further supported by the fact that the trial court ultimately placed significant weight on Tofani's statements when it announced its guilty verdict.

[¶27.] Tofani has not established prejudice. *See* State v. Smiley, 2004 SD 119, ¶5, 689 NW2d 427, 429 (citation omitted). The record reflects that the State initially complied with the discovery order. Once Tofani's counsel apprised the prosecutor of the problem, the state's attorney attempted to assist him by making the original recording available for viewing on the sheriff's computer system. As allowed by the circuit court, counsel also could have hired an expert to remedy the problem with the CDs.[3] Rather than availing himself of the chance to view the CDs before the suppression hearing, counsel moved to exclude the evidence. Even though the court denied his motion, it provided one additional remedy, explaining, "If as a result of any particular tape or whatever or statement defense may desire or need additional time to do anything, I will be most inclined to grant it."

[¶28.] The sole claim that the CDs did not work properly on defense counsel's computer does not establish prejudice. Counsel could have viewed the originals, or

---

3. Indeed, we needed the assistance of our technical staff to get the CDs to work.

could have hired an expert to assist with the technical problems. Further, after Tofani examined the CDs at the suppression hearing, counsel could have requested additional time to prepare.[4] Consequently, we conclude that Tofani suffered no prejudicial error, and the trial court did not abuse its discretion when it denied Tofani's request to exclude the evidence.

### 2. Motion to Suppress Statements

[¶29.] It is undisputed that Tofani was subjected to a custodial interrogation at the Mitchell Police Department on March 6, 2004. Tofani acknowledged his Miranda rights and waived them when he signed a Miranda warning acknowledgement card. Nevertheless, Tofani contends that his statements should be suppressed because they were not given voluntarily, but were the product of undue influence.

[¶30.] When reviewing the voluntariness of a confession, we consider the totality of the circumstances, giving deference to the trial court's factual findings, but performing a de novo review of the record, and making "an independent determination of the ultimate issue of voluntariness." State v. Tuttle, 2002 SD 94, ¶20, 650 NW2d 20, 30 (quoting Beckwith v. United States, 425 US 341, 348, 96 SCt 1612, 1617, 48 LEd2d 1, 8 (1976) (additional citations omitted)). Police deception or

---

4. It was during this hearing that the State requested permission to move ahead through the parts of the recording that were mere silence. Tofani's counsel agreed as long as the times this happened were stipulated to. As a result, when the State said that disk six was forty-five minutes of silence, the defense so stipulated and disk six was not played for the court. The existence of information on disk six does not result in an abuse of discretion by the trial court. It was Tofani's counsel who chose not to take advantage of the opportunity to hire an expert or view the originals.

misrepresentation will be duly weighed; however, "police may use some psychological tactics when interrogating a suspect." State v. Frazier, 2001 SD 19, ¶20, 622 NW2d 246, 255 (quoting State v. Darby, 1996 SD 127, ¶31, 556 NW2d 311, 320). If the defendant's will was overborne so that the admissions were a direct result of law enforcement overreaching, then the confession must be deemed involuntary. *Tuttle*, 2002 SD 94, ¶20, 650 NW2d at 30. In the totality of the circumstances, we review "(1) the defendant's age; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of [his or her] constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep." *Frazier*, 2001 SD 19, ¶20, 622 NW2d at 255 (quoting State v. Smith, 1999 SD 83, ¶36, 599 NW2d 344, 352).

[¶31.] At the time of his arrest, Tofani was thirty-one and had a high school education. Even though Tofani claims he was intoxicated, his video-recorded statements reveal that he understood the questions and provided intelligible answers. In addition, Tofani was informed of his constitutional rights before the questioning began. According to the record, Tofani was not a stranger to the criminal justice system. Furthermore, he was not subjected to a lengthy detention, prolonged questioning, or deprivation of food or sleep. He was placed in a locked interrogation room with cigarettes and a cola. He was permitted to sleep and use the restroom.

[¶32.] Tofani contends that his will was overborne because the detectives used C.M. as bait in order to elicit information. Specifically, Tofani claims that

while they were driving to the motel to retrieve the receipt, Detective Konrad told Tofani he could not see C.M. "until they got the information they wanted." Other than Tofani's allegation, the record does not reflect such coercion.

[¶33.]     The trial court found that "at no time during the interview process was undue influence used by the [police] for obtaining the [statements] and the length of time under the circumstances herein did not reflect an improper utilization of the interrogation techniques." From our review of the record and the videos, we cannot say that the trial court erred: the statements were voluntary under the totality of the circumstances.

### 3. Sufficiency of the Evidence

[¶34.]     Tofani argues that the trial court erred when it found beyond a reasonable doubt that he aided and abetted Reiner in his crimes against C.M. In his appellate brief, Tofani asserts that "the evidence was insufficient to show that there was any common design or purpose" and the "testimony of Reiner at the trial clearly indicated that he acted alone and failed to show any sharing of the criminal intent between Tofani and Reiner." The State, on the other hand, urges that the conviction should be affirmed because "the trial court found a meeting of the minds between Tofani and Reiner. Tofani, who admitted to wanting to ditch [C.M.], essentially set these crimes up to escape."

[¶35.]     Tofani moved for a judgment of acquittal, which was denied. We will not reverse the trial court's denial of a motion for judgment of acquittal or reverse the guilt determination of the trier of fact if we conclude that "the State presented sufficient evidence on which the [court] could reasonably find the defendant guilty

of the crime charged." *Guthrie*, 2001 SD 61, ¶47, 627 NW2d at 420 (citation omitted). Our review of the sufficiency of the evidence is de novo. *Disanto*, 2004 SD 112, ¶14, 688 NW2d at 206.

[¶36.] The crime of aiding and abetting is set out in SDCL 22-3-3:

> Any person who, with the *intent to promote or facilitate the commission of a crime,* aids, abets or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime. (Emphasis added).

To be guilty of aiding and abetting, "the evidence must show the principal offender committed all the elements of the underlying offense." State v. Shearer, 1996 SD 52, ¶29, 548 NW2d 792, 798 (citing Graham v. State, 346 NW2d 433, 435 (SD 1984)). Because, under SDCL 22-3-3, aiding and abetting requires "the intent to promote or facilitate" the crime, the evidence must show that Tofani "knowingly did something to assist" in its commission. State v. Brings Plenty, 490 NW2d 261, 268 (SD 1992) (quoting State v. Schafer, 297 NW2d 473, 476 (SD 1980)).

[¶37.] Here, the trial court concluded beyond a reasonable doubt that the principal offender, Reiner, committed the offenses of kidnapping, rape, and aggravated assault, a conclusion not challenged in this appeal. On Tofani's charges, the court found him not guilty of aiding and abetting the kidnapping, but found him guilty of aiding and abetting Reiner in the crimes of rape and aggravated assault. We must decide whether there was sufficient evidence to sustain Tofani's convictions. *Guthrie,* 2001 SD 61, ¶47, 627 NW2d at 421. *"[A]ll of the evidence* is to be considered in the light most favorable to the prosecution." Jackson v. Virginia, 443 US 307, 319, 99 SCt 2781, 2789, 61 LEd2d 560 (1979) (emphasis in original). There must be substantial evidence to support the conviction. Glasser v. United

States, 315 US 60, 80, 62 SCt 457, 469, 86 LEd 680 (1942), *superseded on other grounds,* Bourjaily v. United States, 483 US 171, 107 SCt 2775, 97 LEd2d 144 (1987). The "inquiry does not require [an appellate] court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson*, 443 US at 318-19, 99 SCt 2781, 2789, 61 LEd2d 560 (emphasis in original) (quoting Woodby v. Immigration and Naturalization Serv., 385 US 276, 282, 87 SCt 483, 486, 17 LEd2d 362 (1966)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Evidence is insufficient, and therefore not substantial, when no rational trier of fact could find guilt beyond a reasonable doubt. *Id.*

[¶38.]    The record before the trial court included testimony from the law enforcement officers involved, the victim, Wade Reiner, Reiner's spouse, and a witness from Sudz, and physical evidence such as the photographs of C.M.'s injuries, the motel room key, as well as the CDs containing the video recordings of Tofani's interrogation. Tofani did not testify.[5] In its oral findings, the court began by summarizing the evidence it considered relevant. First, the court found that Reiner knew detailed information about C.M., information he could not have

---

5.    Even though all seven CDs were entered into evidence for the suppression hearing, only CD three (from twelve minutes through thirty-seven minutes) and CD seven (from four minutes and thirty-six seconds up through ten minutes and fifty-one seconds) were entered into evidence in the trial. There were other exhibits offered by the State and the defense, however, they are not pertinent to the court's verdict.

learned without Tofani.[6]  Then, the court concluded that Reiner knew there was a

plan to leave C.M. in Mitchell.  The court further found that Tofani made

derogatory remarks about C.M. in Reiner's presence.  Finally, the court stated that

Reiner not only knew what motel C.M. was at, but exactly which room she was

staying in.  Based on this, the court concluded:

> I don't think I have any doubt in my mind whatsoever at the time of leaving, at the time of leaving the Sioux Falls Pilot that Mr. Tofani, the defendant, became aware of and part of this gal's gonna get disciplined.  Period.  I think he formed that intent that Wade Reiner would commit an unlawful act or a wrong, to-wit, criminal offense, upon [C.M.].
>
> I further find specifically that after he left Mitchell, when apparently he thought it was okay for her to get batted around a little bit and maybe even screwed without her consent from that standpoint, but that while traveling with Mr. Reiner he became very uneasy. . . .  I don't trust him anymore.  Things are getting out of hand.  And I think that beyond a reasonable doubt from that moment on he was trapped.
> ***
> Now, at some point between leaving Mitchell and arriving in Sioux Falls Mr. Tofani is worried about Mr. Reiner.  And has made up his mind that he is returning.  And the court can find beyond a reasonable doubt that he's guilty of the offense of aiding and abetting aggravated assault.  I have no problems with that.

[¶39.]     With respect to the rape charge, the court found:

> Now as concerns the aiding and abetting as far as the rape is concerned, the court finds the defendant guilty beyond a reasonable doubt.  Basically speaking I think it became apparent to Mr. Tofani what was taking place sometime during the ride over to Sioux Falls and during his subsequent supper with the defendant, Mr. Reiner, from that standpoint and he became very concerned and by his own testimony he desired to

---

6.     For example, Reiner knew C.M. was from Florida, had a terrible past there, and was fearful of returning.  Reiner also had reason to believe C.M.'s mother had money and would pay a ransom if Reiner demanded.

return as quickly as possible to Mitchell. And that desire was out of fear for his fiancée's safety. Things had gotten out of hand.

The distinction I want to make is this. I don't think that it's necessary when they left Sioux Falls, that is Mr. Tofani and Mr. Reiner, that the plan to abet the commission of a criminal offense or a wrongdoing may have been fully formed.[7] I think it became apparent to the defendant at some time, that is Mr. Tofani, that this was a serious matter and no longer fun and games. Now he has testified himself by virtue of the statement that he thought these matters were fun and games. However, during the course of the trip it became apparent to him in this court's opinion that Reiner was far more than appeared on the surface. . . . [B]efore he returned he made no effort to extract himself from the anticipated wrongdoing. There's no evidence that [C.M.] was ever called or warned. He was aware of where she was located. She's in the motel room. Got a telephone number.

***

And I do believe to one extent that Mr. Tofani may have gotten cold feet, I think at that stage of the proceedings that he has aided, two-wit, he has abandoned the victim to the motel. . . .

And so as concerns the charge of aiding and abetting the rape count in count two, I find the defendant guilty.

[¶40.] Concededly, some of the judge's remarks are contradictory, but the overall conclusions the court reached are consistent. To put it in the judge's blunt idiom, he found that at some point while Reiner and Tofani were together, they reached an understanding—Tofani was "*part of* this gal's gonna get disciplined"— and that C.M. was going to be "batted around a little bit and maybe even screwed without her consent." (Emphasis added). The court reasoned that Tofani's "plan to

---

7.    From reading the entirety of the court's findings, it is apparent that he meant to say "when they left <u>for</u> Sioux Falls" not "left Sioux Falls" because Tofani and Reiner did not leave Sioux Falls together.

abet the commission of a criminal offense or a wrongdoing" may not have been fully

formed before they left Mitchell, but Tofani became increasingly aware that "Reiner

was far more than appeared on the surface," and even though he "may have gotten

cold feet," Tofani persisted in the plan. He did nothing to "extract himself from the

anticipated wrongdoing" or warn C.M.

[¶41.]     Now the question becomes whether the evidence adduced at trial was

sufficient to sustain the convictions. In reviewing the record, we must draw all

reasonable inferences from the evidence in favor of the verdict.[8] Undoubtedly,

Tofani and Stone discussed C.M. in unwholesome terms while at Sudz with Reiner.

Tofani and Stone made repeated derogatory remarks about her. Tofani admitted

that they were sick of her, that they wanted to leave her, and that she should go

back to Florida. There was also discussion between the three that she should be

"roughed up" and that a woman like her should be raped, beaten, and killed.

[¶42.]     When Tofani was asked about these remarks during his interrogation,

he explained that it was Stone who said that a woman like that should be beaten,

raped, and killed. Reiner responded with, "there should be a place you could take

'em and have that done." But Reiner went further, saying that he "had no problem

---

8.     Defense counsel argued at trial that Reiner's testimony required
       corroboration. SDCL 23A-22-8 provides:

              A conviction cannot be had upon the testimony of an accomplice unless
              it is corroborated by other evidence which tends to connect the
              defendant with the commission of the offense. The corroboration is not
              sufficient if it merely shows the commission of the offense, or the
              circumstances thereof.

       We think that Tofani's admissions provided sufficient corroboration.

doing it," he "would take care of it"; he would go over to her motel room and "take care of it." Tofani confirmed to police that Reiner made these remarks to him. And sometime later that day, although he minimizes its significance, Tofani showed Reiner what room C.M. was staying in. At one point, Tofani even gave Reiner C.M.'s room key. He later told police he did this so that Reiner could turn it in at the motel office. Stone took the key back because, according to Tofani, he and Stone became concerned about C.M.'s safety.

[¶43.] Reiner's testimony on Tofani's participation was inconsistent.[9] On the

---

9. Direct examination Reiner:

***

**Q:** Did you ever get the perception you were dealing with any con men?
**A:** Did I have that perception, yes, I do believe I did. But I thought I was smarter than that, so.
. . .
**Q:** Does either Mr. Tofani or Mr. Stone ever make any statements to you about doing whatever you wanted with [C.M.]?
. . .
**A:** It came up once before in the Sudz bar, but I hadn't, I hadn't paid a whole lot of mind to a lot of the conversation that was going on because, like I said, I was pretty down on myself and drinking, and somebody else had it worse than I did, I thought, you know. My intentions were to help these two guys out. Not to – not this, okay.
. . .
**Q:** Would it be fair to say the stop back at the motel and picking up [C.M.] and events that followed that be part of helping them out?
**A:** I believe it would have helped them out, yes. 'Cause I believe they wanted her run out of town. I mean they wanted her back in Florida. That was the opinion I had gained through the night, okay.

***

**Q**: John Tofani ever make any statements to you alluding to or hinting at any future activities or interaction you might have with [C.M.]?
***
**A**: Everything that I was on assumption, okay. I assumed that it was - -
THE COURT: That's a yes-or-no question.
THE WITNESS: Yes.

(continued . . .)

_____

(. . . continued)

**Q**:     And what statement did he make to you, Wade.
**A**:     That I had paid for her.  I mean, we talked about that in the bar that I'd paid for her.

On cross examination, Reiner testified:

. . .
**Q**:     And there were no strings attached to you giving them a ride to Sioux Falls; is that correct?
**A**:     That's correct too.  My intent was to help 'em out.  I had – they had nothing to give back in return, so I was just helping.
**Q**:     And in fact, you never bought [C.M.] from them, did you.
**A**:     No.
. . .
**Q**:     John Tofani never specifically asked you to harm [C.M.] in any way, did he?
**A**:     That is correct.
**Q**:     And Tim Stone never specifically asked you to harm [C.M.] in any way, did he?
**A**:     That is correct.
**Q**:     And isn't it true that [Tofani] never paid you to harm [C.M.]?
**A**:     That is correct also.
**Q**:     And [Stone] never paid you to harm [C.M.] too?
**A**:     That's correct also.
**Q**:     In fact, there was never any specific discussion with [Tofani or Stone] regarding paying them – them paying you or you paying them to do anything with [C.M.]?
**A**:     That is correct.
. . .
**Q**:     In fact, you had no intentions of even returning to Mitchell that day, did you?
**A**:     That is correct.
. . .
**Q**:     But somehow you ended up in Mitchell, is that right?
**A**:     That's correct.
**Q**:     But you really cannot explain why?
**A**:     No, I can't explain why.  I ask myself that question every day how I ended up there."

On redirect examination, Reiner testified:

**Q**:     Mr. Tofani's statement to you on the way to Sioux Falls that you'd paid for it, you can do anything you wanted with it was not as a result of this transaction or anything - -

(continued . . .)

-22-

one hand, Reiner stated many times that there was no specific conversation where he was asked to harm C.M., but that it was his "assumption" that his attack on C.M. was what Tofani wanted. Nonetheless, on direct examination, he testified that Tofani said to him that he had "paid for her." Reiner emphasized: "I mean, we talked about that in the bar that I'd paid for her." The court found that Reiner was a liar, but nonetheless did not discount all his testimony.

[¶44.]     Did Tofani have the intent to promote or facilitate the assault and rape of C.M.? Criminal intent describes a condition of the mind. Those who unwittingly aid a perpetrator do not become aiders and abetters when they later learn of the perpetrator's criminal purpose. People v. Nguyen, 26 CalRptr2d 323, 336 (CalApp 1993). Did Tofani unwittingly reveal information about his fiancée that later

_____

(. . . continued)

A:     That's correct.
Q:     Or anything that you expected; right?
A:     That is correct.
Q:     Or offered by him?
A:     That is correct. Not accepted.
Q:     Was there any doubt in your mind after that is five hours of - - or so of conversation with Mr. Tofani and Mr. Stone that they intended to have something done with [C.M.]?

***

A:     That was my assumption, but like I said there was a lot of alcohol involved –
Q:     Sure.
A:      -- at the time so it was my assumption.
Q:     And that something was to be done was to ensure that she did not accompany them further; is that right?
A:     That was also my assumption.
Q:     Based on the way the conversation went –
A:     Based on the conversation.
Q:     And based on Mr. Tofani's statements in part?
A:     Yes. And Mr. Stone's.

exposed her to harm?

[¶45.] Circumstantial evidence is critically important in these types of cases because a state of the mind is rarely proved by direct evidence. *United States v. Smallwood*, 443 F2d 535, 541 (8thCir 1971); *United States v. Prionas*, 438 F2d 1049, 1053 (8thCir 1971), *cert. denied*, 402 US 977, 91 SCt 1683, 29 LEd2d 144 (1971). Viewed in a light most favorable to the prosecution, the evidence revealed that Tofani not only knew of Reiner's criminal purpose, he instigated it. From Tofani and Stone, Reiner learned that C.M. was alone and vulnerable. And they said much more. Tofani told Reiner that he wanted to rid himself of his fiancée, that she was a "crack whore" available for easy sex, someone to be "roughed up and sent out of town." Tofani admitted that terms such as "beaten" and "raped" were used, although they did not come from his mouth. Reiner responded by saying that he "had no problem doing it," and he "would take care of it." Reiner testified that Tofani told Reiner that he had "paid for her." Thereafter, Tofani showed Reiner where C.M. was staying and even momentarily gave Reiner her room key. Although Reiner testified that Tofani never directly told him to do anything, and he only "assumed" that what he did was what Tofani wanted, the court was not bound to accept Reiner's testimony undigested. It could use its judgment and experience in concluding that no explicit direction was necessary, that what was to be done was understood.

[¶46.] We conclude, based on all the evidence, both circumstantial and direct, that a rational trier of fact could reasonably infer that Tofani knowingly assisted in the commission of these crimes. *Brings Plenty*, 490 NW2d at 268; *Schafer,* 297

NW2d at 476. Giving due deference to the trial court's credibility findings, and considering the proof in a light favorable to the State, there was sufficient evidence to sustain the guilty verdicts for aiding and abetting aggravated assault and rape.

[¶47.]    Affirmed.

[¶48.]    GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶49.]    SABERS, Justice, dissents.


SABERS, Justice (dissenting).

[¶50.]    I dissent because there is no evidence in the record which, even "if believed by the [trial court], is sufficient to sustain a finding of guilt beyond a reasonable doubt." State v. Pasek, 2004 SD 132, ¶7, 691 NW2d 301, 305. In fact, the majority uses Tofani's distasteful and derogatory comments as sufficient evidence of guilt *beyond a reasonable doubt* of aiding and abetting aggravated assault and rape.

[¶51.]    The evidence in this case proved that Tofani and Stone made distasteful and derogatory remarks about C.M. to a stranger they met at a bar. Little did they know, the stranger (Reiner), fantasized about committing violent sexual acts against women.[10]  By the time Tofani became suspicious of Reiner, Reiner was already on his way back to Mitchell. While this evidence shows Tofani's conduct was lewd and careless, it is not sufficient to sustain a finding of guilt

---

10.    Police recovered pornographic images from Reiner depicting a woman bound at her wrists and ankles.

beyond a reasonable doubt that he intended to "promote or facilitate the commission of a crime." *See* SDCL 22-3-3.

[¶52.] The majority supports much of its decision with the testimony of Reiner, who the trial court found was *not credible* and a very sick man. In addition to Reiner's inability to tell the truth, the State offered no evidence that Tofani made any statements with the intent that Reiner rape and assault C.M. Instead, Reiner testified on cross-examination:

> Q: John Tofani never specifically asked you to harm [C.M.] in any way, did he?
>
> A: That is correct.
>
> Q: And Tim Stone never specifically asked you to harm [C.M.] in any way, did he?
>
> A: That is correct.

As to Tofani pointing out the motel room where he and C.M. were staying, Reiner testified that they were driving past the motel and Tofani "might of said they were in the last room. . . ."

[¶53.] As the majority recognizes, the trial court's findings are contradictory. Majority Opinion ¶40. The definition of aiding and abetting requires a defendant to *act with the intent* of promoting or facilitating the commission of a crime. *See* SDCL 22-3-3. The acts the State alleged constituted aiding and abetting were Tofani's statements about C.M. and his divulging certain facts, all of which occurred in Mitchell. However, the trial court found that Tofani did not become aware that Reiner was "serious" until sometime during the trip to Sioux Falls. Majority Opinion ¶39. This finding completely contradicts the State's allegation that Tofani

made these comments and divulged these facts with the intent to aid and abet or facilitate Reiner in the rape and assault of C.M..

[¶54.] More importantly, the evidence at trial was clear that Reiner did not form the intent to commit the offenses until after he left Tofani and Stone in Sioux Falls and began traveling home to Alexandria.[11] How could Tofani be guilty beyond a reasonable doubt for aiding and abetting a crime Reiner had not contemplated until after he left Tofani and Stone?

[¶55.] Another defect in the State's case is that the trial court dismissed the charge against Tofani for aiding and abetting the crime of kidnapping. As a practical matter, the evidence for aiding and abetting the crime of kidnapping was comparable to the evidence of aiding and abetting the crimes of aggravated assault and rape. The fact is that the evidence on all three crimes was insufficient to prove guilt beyond a reasonable doubt for *any* of the three crimes.

[¶56.] A fair review of the evidence**,** even under the most deferential standard of review, shows the State failed to prove every element of the crimes beyond a reasonable doubt, especially when, according to the trial court, Reiner was *not a credible witness.*

---

11. On direct examination by the State, Reiner testified:

> Q: What brought you back to Mitchell?
> A: What brought me back to Mitchell, I'm still trying to figure that one out myself.

Similarly, on cross-examination Reiner testified:

> Q: In fact, you had no intentions of even returning to Mitchell that day, did you?

(continued . . .)

[¶57.]     The fact that Tofani was coarse and careless in his comments concerning C.M. is not sufficient evidence of guilt beyond a reasonable doubt for aiding and abetting.  Likewise, the fact that Tofani eventually became suspicious about Reiner is insufficient to prove that Tofani had the requisite knowledge or intent to support convictions of aiding and abetting.  Rather than parse selected facts from the testimony of a liar and rapist, or attempt to make sense of the trial court's contradictory findings, we should reverse Tofani's convictions for aiding and abetting aggravated assault and rape.  State v. Motzko, 2006 SD 13, ¶26, 710 NW2d 433, 441 (Sabers, J., dissenting) (when the evidence falls short of sustaining a finding of guilt beyond a reasonable doubt, "we should not hesitate to reverse").

---

(. . . continued)
            A:     That is correct.